IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 04-133 JJF |
| | : | |
| RYSHEEN BOWERS, | : | |
| | : | |
| Defendant. | : | |

Colm F. Connolly, Esquire, United States Attorney, and Shannon
Thee Hanson, Esquire, Assistant United States Attorney, UNITED
STATES ATTORNEY'S OFFICE, DISTRICT OF DELAWARE, Wilmington,
Delaware.
Attorneys for Plaintiff.

Penny Marshall, Esquire, Federal Public Defender, UNITED STATES
PUBLIC DEFENDER'S OFFICE, DISTRICT OF DELAWARE, Wilmington,
Delaware.
Attorney for Defendant.

**MEMORANDUM OPINION**

August 15, 2005
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is a Motion To Suppress Evidence And Statements (D.I. 12) filed by Defendant, Rysheen Bowers. For the reasons discussed, the Motion will be denied.

## I.  PROCEDURAL HISTORY

On November 18, 2004, a grand jury charged Bowers in a one count indictment with being a felon in possession of a firearm. On February 10, 2005, Bowers filed the instant Motion To Suppress Evidence And Statements (D.I. 12). The Motion seeks to suppress any and all evidence seized from Bowers or his home and any statements made on October 7, 2004, the date of Bowers' arrest. The Court held an evidentiary hearing on the Motion on April 21, 2005. At the hearing, counsel for the Government represented that he intended to admit into evidence at trial only the handgun seized the night of the arrest, and no other items or statements.

## II.  FACTS

On October 6, 2004, Senior Probation Officer James Kelly initiated the standard procedure for performing an administrative search of a probationer's residence based on his belief that Bowers possessed contraband in violation of his parole. First, Officer Kelly verified that Bowers was on Level One, unsupervised probation and that Bowers lived at his listed address. Next, Officer Kelly approached his supervisor, Patrick Cronin, for approval. Officer Kelly expressed five reasons for suspecting

1

that Bowers possessed contraband:  (1) in 1995, Bowers was
convicted in the State of Virginia for possession of cocaine with
the intent to distribute; (2) in 2000, Probation received
information that Bowers was affiliated with drug dealers; (3) in
June 2000, Bowers was arrested on felony drug charges; (4) in
2002, the Governor's Task Force obtained information that Bowers
was active in the sale of illegal drugs; and (5) in October 2004,
a confidential informant gave information to the Governor's Task
Force, through Detective Stout of the Delaware Police Department,
that Bowers was still active in the sale of illegal drugs.  Based
on their discussion, Supervisor Cronin gave Officer Kelly
approval for the requested search.

Officer Kelly also completed and signed a pre-search
checklist (Government Hrg. Ex. 1), which Supervisor Cronin also
signed.  The checklist asked whether Officer Kelly had sufficient
reason to believe that Bowers possessed contraband in violation
of Bowers' parole, to which Officer Kelly checked "YES." However,
when asked whether he had "[i]nformation from a reliable
informant indicating [that the] offender possesses contraband or
is violating the law," Officer Kelly checked "NO."  He also
checked "NO" to the question of whether "[i]nformation from the
informant [was] corroborated."  When asked why he did not check
"YES" to these questions, Officer Kelly testified, "[t]here [was]
no reliable informant that told me directly" that Bowers

2

possessed contraband.   (D.I. 20 at 19-20, emphasis added.)   In
other words, Officer Kelly omitted the informant's tip from the
checklist because he did not know the informant personally, but
rather, relied on Detective Stout's representations concerning
the informant.

After completing the checklist, Officer Kelly assembled a
team from the Governor's Task Force to carry out the
administrative search.   Probation Officers Kate Edwards and Mark
Lewis and Delaware State Police Detectives Christopher Popp,
Dewey Stout, and Edward Sebastianelli accompanied Officer Kelly.
The Probation Officers were to conduct the search, and the police
officers were to provide security.

Shortly after midnight on October 7, 2004, the team of
officers arrived at Bowers' house located at 123 Whitburn Street,
Newark, Delaware.   Bowers' residence was a two-story townhouse
adjoined by other townhouses.   Officers Kelly, Edwards, Stout and
Sebastianelli approached the front door, while Officers Lewis and
Popp walked to the back of the premises to prevent anyone from
leaving or discarding evidence through the back door.

Probation Officer Edwards knocked on Bowers' front door.
Bowers responded by speaking through his second floor window and
asking Officer Edwards who she was.   Officer Edwards replied,
"Katie."   Bowers indicated he did not know a "Katie."   Officer
Edwards eventually told Bowers that she was with Probation and

3

Parole and that the State Police were there with her.  She then asked Bowers to answer the door.  Bowers responded, "Okay, wait a minute."

While the officers at the front of the house waited for Bowers to open the door, Detective Popp and Officer Lewis stood in Bowers' backyard and viewed the back of the house, which was illuminated by the lights from the houses in the area.  After a brief period of time, the officers observed Bowers appear at the house's left-hand, second-story window.  He was bare-chested and wearing a sweatband around his neck.  Bowers opened the window, leaned out of it, shook something out, and went back inside. Moments later, Bowers returned to the window, leaned out again, and threw an object into the yard next door, which landed with a loud thud.  The officers hurried to retrieve the object, which turned out to be a Ruger 9mm handgun, the gun Bowers is presently charged with possessing.  Immediately, Detective Popp went to the front of Bowers' house to show the other officers the gun.

Meanwhile, the officers at the front of the house continued to wait for Bowers to open the door.  After being shown the gun by Detective Popp, the officers called Supervisor Cronin to advise him of the situation.  After the Cronin conversation, the officers forced entry into Bowers' house and found Bowers and his friend, Tanesha Pickney.

### III. PARTIES' CONTENTIONS

By his motion, Bowers contends that the handgun seized on October 7, 2004, should be suppressed because (1) the officers lacked reasonable suspicion to conduct an administrative search of his home, and (2) the seizure of the firearm was a direct result of the officers' unlawful presence in Bowers' rear curtilage.  In response, the Government contends that (1) the officers had reasonable suspicion to conduct the search, and (2) the seizure of the abandoned gun was not a search.

### IV. DISCUSSION

A.   <u>Whether The Seizure Of The Abandoned Gun Was A Search</u>

First, the Court will discuss whether the seizure of the abandoned gun was a "search."  The Government contends that the seizure of the abandoned gun was not the fruit of the administrative search, because Bowers threw the gun into the neighbor's yard before the officers entered the house.  Thus, the Government asserts that the recovery of the gun was merely a police inspection of abandoned property, which is not subject to the protections of the Fourth Amendment.

At the heart of the Government's position is its contention that the search commenced when the officers entered Bowers' house, not when the officers entered Bowers' backyard.  The Court disagrees with the Government's position.  "[T]he Fourth Amendment protects the curtilage of a house."  <u>United States v,</u>

5

Dunn, 480 U.S. 294, 301 (1987); United States v. Acosta, 965 F.2d 1248 (3d Cir. 1992).  "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself."  Id.

The Court concludes that Bowers had a reasonable expectation of privacy in his backyard, and therefore, Bowers' backyard was curtilage protected by the Fourth Amendment.  When Detective Popp and Officer Lewis entered Bowers' backyard, the Court concludes that they initiated a search subject to the Fourth Amendment. Their observation of Bowers tossing the gun into the neighbor's yard was made in connection with that search.  Accordingly, the seizure of the gun was the fruit of a search regulated by the Fourth Amendment.

B.   Whether The Officers Conducted A Lawful Search

Having concluded that the officers obtained the gun by conducting a search regulated by the Fourth Amendment, the Court must next consider whether Bowers' Fourth Amendment rights were violated by the search.  The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."  U.S. Const. amend. IV.  "A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'"

6

Griffin v. Wisconsin, 483 U.S. 868, 872 (1987).  However, "[a]
State's operation of a probation system ... presents 'special
needs' beyond normal law enforcement that may justify departures
from the usual warrant and probable-cause requirements."  Id. at
873-74.  Accordingly, probation officers may search a
probationer's residence based on a reasonable suspicion that the
probationer is engaged in criminal activity therein.  United
States v. Knights, 534 U.S. 112 (2001); Griffin v. Wisconsin, 483
U.S. 868 (1987); United States v. Baker, 221 F.3d 438 (3d Cir.
2000); United States v. Hill, 967 F.2d 902 (3d Cir. 1992).

The United States Supreme Court has noted that "the concept
of reasonable suspicion is somewhat abstract."  United States v.
Arvizu, 534 U.S. 266, 274 (2002). "While 'reasonable suspicion'
is a less demanding standard than probable cause and requires a
showing considerably less than a preponderance of the evidence,
the Fourth Amendment requires at least a minimal level of
objective justification...."  Illinois v. Wardlow, 528 U.S. 119,
123 (2000).  Additionally, "[r]easonable suspicion, like probable
cause, is dependent upon both the content of information
possessed by police and its degree of reliability.  Both
factors--quantity and quality--are considered in the totality of
the circumstances--the whole picture that must be taken into
account when evaluating whether there is reasonable suspicion."

Alabama v. White, 496 U.S. 325, 329 (1990) (internal citations
and quotation marks omitted).

Generally, for a suspicion to be reasonable, an officer must
be able to articulate specific facts that support the suspicion,
and thus, justify the intrusion. Terry v. Ohio, 392 U.S. 1, 21
(1968). "Anything less would invite intrusions upon
constitutionally guaranteed rights based on nothing more
substantial than inarticulate hunches." Id. at 22. In
evaluating whether a particular search was reasonable, "it is
imperative that the facts be judged against an objective
standard:  would the facts available to the officer at the moment
of the seizure or the search 'warrant a man of reasonable caution
in the belief' that the action taken was appropriate?" Id. at
21-22.

Applying this standard to the circumstances presented in
this case, the Court concludes that Officer Kelly had reasonable
suspicion to conduct the administrative search of Bowers' home.
Officer Kelly had four sources of information indicating that
Bowers continued to be involved with illegal drugs since his drug
conviction in 1995. In October 2004, a month before the search,
a confidential informant told Detective Stout that Bowers was
still active in the sale of drugs. Although Officer Kelly
received the information indirectly through Detective Stout, the
tip was not Officer Kelly's sole source of information. Taking

8

the informant's tip in conjunction with the other information known to Officer Kelly, and cited previously, concerning Bowers' ongoing involvement with drugs, the Court concludes that the facts available to Officer Kelly were sufficient to give rise to a reasonable belief that Bowers possessed contraband on October 7, 2004.  Accordingly, the Court concludes that the State Task Force officers had reasonable suspicion to conduct an administrative search of Bowers' home, and therefore, neither the officers' forced entry into Bowers' home nor the officers' presence in Bowers' curtilage violated the Fourth Amendment.

## V.   Conclusion

For the reasons discussed, the Court will deny Bowers' Motion To Suppress Evidence And Statements (D.I. 12).

An appropriate order will be entered.