IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 04-133-KAJ |
| ) | |
| RYSHEEN BOWERS, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM ORDER

I.  INTRODUCTION

This criminal case is before me on the motion of defendant, Rysheen Bowers, to suppress evidence taken from his neighbor's back yard. (Docket Item ["D.I."] 12: the "Motion".) Because I conclude that the evidence was obtained incident to a lawful search, the Motion is denied.

II.  BACKGROUND

A.  Procedural Background

This case has more than the average procedural complexity, having already been the subject of an earlier decision on an earlier motion to suppress. (D.I. 38.) The case was first assigned to the Honorable Joseph J. Farnan, Jr., who held a hearing on the first suppression motion on April 21, 2005. (*Id.* at 1.) After considering the parties' briefing and the record created before him, Judge Farnan concluded that the motion should be denied, since the evidence in question was seized pursuant to an appropriate administrative search of Bowers's residence. (*Id.* at 9.)

Coincidentally, on the same day that Judge Farnan issued his decision on the motion, the defense moved to dismiss the indictment or to reopen and amend the record, on the basis that the Government had wrongly delayed providing a fingerprint report to the defense. (D.I. 35.) Judge Farnan denied the motion to dismiss but granted the motion to reopen the record. (D.I. 45.) Before the record was reopened and new evidence considered, however, the case was reassigned to me. (*See* D.I. 52.)

Neither party asks me to write on a clean slate now. Both the Government and Bowers have cited, as it suits their purposes, the record created before Judge Farnan and certain of his conclusions. (*See, e.g.,* D.I. 69 at 11-12; D.I. 70 at 12-14, 27; D.I. 75 at 5.) While I have reviewed portions of the earlier transcript as required to evaluate Bowers's efforts to impeach the credibility of Government witnesses, *cf.* Fed. R. Ev. 801(d)(1)(A) (A statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition ... ."), I have otherwise based my decision on the record created before me at the second suppression hearing on March 14, 2006.[1]

---

[1] The tardily produced fingerprint report, which was the entire basis for re-opening the suppression record, was barely mentioned either at the second suppression hearing or in the subsequent briefing.

B. Factual Background

In October of 2004, Rysheen Bowers was on Level I probation in the State of Delaware (D.I. 68 at 6),[2] for driving with a suspended license. (*Id.* at 32, 156.) James Kelly is a Senior Probation Officer in the State's Department of Probation and Parole (*id.* at 5) and is also a member of an interagency group of law enforcement and probation officers known as the "Governor's Task Force" ("GTF"). Among Officer Kelly's responsibilities is conducting searches of probationers' residences, which is undertaken at times with the support of other members of the GTF. (*See id.* at 7.) Typically, probation officers will conduct such searches pursuant to their administrative authority, while officers of the Delaware State Police ("DSP") provide security protection. (*See id.* at 7-8, 114-15.) Shortly after midnight on October 7, 2004, Officer Kelly led a team of probation officers, supported by DSP officers, on an administrative search of Bowers's residence at 123 Whitburn Place in Newark, Delaware. (*Id.* at 26; Gov't Ex. 1.)

The Government and Bowers disagree about the motivation for the search. According to the Government, and as outlined by Officer Kelly in his testimony, the search was touched off by a tip from an informant who told DSP Detective Dewey Stout that Bowers was involved in illegal drug trafficking. (*See* D.I. 68 at 13.) Officer Kelly did not know who the informant was and did not speak to the informant. (*Id.* at 14-15, 19, 43.) Although Detective Stout had learned the information within a week or two before the October 7 search, he did not tell Officer Kelly about it until the evening of October 6,

---

[2]Docket Item 68 is the transcript of the suppression hearing held on March 14, 2006.

3

2004, shortly before Stout accompanied Kelly as Kelly went out to conduct curfew checks on probationers. (*See id.* at 21, 111-12.)

That same evening, based on the tip, Officer Kelly conducted some background research on Bowers, which he then discussed with a supervisor, Patrick Cronin. (*Id.* at 13, 15.) Officer Kelly decided an administrative search was appropriate, based on the following:

> (1) Bowers had been convicted in Virginia in 1995 for possession with intent to deliver cocaine (*id.* at 11-12);
> (2) sometime prior to January of 2000, the GTF received information that Bowers was again involved in illegal sales of drugs (*id.* at 12);
> (3) in June of 2000, Bowers was arrested for a felony drug offense (*id.* at 12, 15-16);
> (4) in 2002, the GTF received information indicating that Bowers was again actively involved in illegal sales of drugs (*id.* at 12-13); and
> (5) Detective Stout's informant asserted that Bowers was currently involved in illegal sales of drugs (*id.* at 13-15; *see also* D.I. 38 at 2).

Supervisor Cronin discussed the matter with Officer Kelly and concurred that a search was appropriate. (D.I. 68 at 11-13, 112.)

Officer Kelly filled out an "Arrest-Search Checklist" form documenting the authorization he received to conduct the search. (Gov't Ex. 1.) Under the portion of the form entitled, "Search Decision Factors," there are five criteria listed, each of which is followed by spaces to be marked as either "yes" or "no." Kelly checked "yes" as to "Sufficient reason to believe the offender possesses contraband[,]" as to "Sufficient reason to believe the offender is in violation of his/her probation or parole[,]" and as to "Approval obtained from a Supervisor, Manager, or Director." (*Id.*) However, he checked "no" as to "Information from a reliable informant indicating offender possesses

4

contraband or is violating the law[,]" and "Information from the informant is corroborated." (*Id.*) He explained that he checked "no" on those two criteria because he did not personally know the informant and "could not tell you his reliability." (D.I. 68 at 19; *see also id.* at 50-51.) Officer Kelly and Supervisor Cronin signified the decision and approval to conduct the search of Bowers's residence by signing the "Arrest-Search Checklist" form. (*See* Gov't Ex. 1.)

Bowers's view of the decision to search his premises is quite different. As he sees it, the search form was a sham to cover up what really happened. The gist of the defense is that Detective Stout and Officer Kelly wanted to find an individual named Terrence Everett, whom Stout thought was a cousin of Bowers's, and that Stout and Kelly went to Bowers's residence thinking Everett might be there.[3] (*See* D.I. 70 at 7-8.)

Whatever the motivations, it is undisputed that members of the GTF did end up at Bowers's residence shortly after midnight on October 7th. Probation Officers Kelly, Edwards, and Lewis were accompanied by DSP Officers Stout, Sebastianelli, and Popp. (Gov't Ex. 1.) Probation Officers Kelly and Edwards went to the front door with DSP Officers Stout and Sebastianelli, while Probation Officer Lewis and DSP Officer Popp went to the rear of the house to prevent anyone from leaving by the back door or discarding evidence. (D.I. 68 at 26, 72, 75, 115.) One of the Probation Officers, Kate Edwards, knocked on the front door, and Bowers answered from an upstairs window,

---

[3] One of Bowers's neighbors testified that he heard one of the officers "yelling for Terrance [sic] to come out[,]" when they were at Bowers's residence the night of the search. (D.I. 68 at 176.)

5

asking who was at the door.[4] (*Id.* at 13-14, 117.) Edwards endeavored to lure Bowers down to the door by feigning familiarity, identifying herself simply as "Katie." (*Id.* at 27.) Bowers said he didn't know any Katie, and she responded again, "it's me, Katie." (*Id.*) After Bowers again rejected the ploy, Officer Edwards identified herself as a Probation Officer and told Bowers to come and unlock the door. (*Id.*)

At that point, Bowers said, "wait a minute." (*Id.*) While the officers in front waited, Bowers went to a second-story rear window and, according to DSP Detective Popp, leaned out and emptied a plastic bag by shaking it, then went away from the window, returned a moment later, leaned out the window again and threw an object into the back yard of a neighboring townhouse. (*Id.* at 78.)[5] The object landed with a discernable "thud." (*Id.* at 98.) Popp went onto the deck at the rear of 123 Whitburn, climbed over a privacy fence into the neighbor's back yard, and retrieved a loaded handgun.[6] (*Id.* at 79.) He radioed Detective Stout, telling him that a gun had just been thrown out the window, and then took the gun to Stout. (*Id.*) The officers in the front immediately knocked again and demanded entry. (*Id.* at 28.) When no one came to the door, Officer Kelly called Supervisor Cronin and asked permission to forcibly enter the home. (*Id.*) Cronin gave permission, and the Probation and DSP officers kicked in the front door. (*Id.*) They looked through the house and found only Bowers and a

---

[4]While the officers could not identify Bowers immediately, after entering the residence, they recognized Bowers to be the individual who had addressed them from the window. (*See* D.I. 68 at 27, 117.)

[5]As with the officers in front of the house, Detective Popp did not know Bowers's identity when he first saw him but later identified him. (D.I. 68 at 78-80, 87, 97.)

[6]The gun is the basis of the charge pending against Bowers in this court.

6

woman. (*Id.*) No one else had entered or exited the house since the GTF members' arrival. (*Id.*)

III. LEGAL STANDARD

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, ... the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995). When, as in this case, the search took place without a warrant, the defendant has made the necessary showing to shift the burden to the Government. *United States v. Chambers*, 228 F. Supp. 2d 474, 476 (D. Del. 2002) (citing *United States v. Herrold,* 962 F.2d 1131, 1137 (3d Cir.1992)). The Government bears its burden by establishing by a preponderance of the evidence "that the warrantless search was conducted pursuant to one of the exceptions to the warrant requirement." *Id.*; *see also United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden [on the Government] than proof by a preponderance of the evidence").

IV. DISCUSSION

The Government's primary argument is that Bowers abandoned the gun by throwing it into the neighbor's yard. Judge Farnan rejected that argument because he concluded that a search began when Detective Popp[7] entered Bowers's backyard,

---

[7] Judge Farnan also mentioned Officer Lewis's presence at the rear of the house (D.I. 38 at 5-6), but the parties have not addressed that in their briefing before me, which I take as an indication that they agree the presence of an additional officer is of no legal consequence.

7

since "Bowers had a reasonable expectation of privacy in his backyard ... ." (D.I. 38 at 6.) With this second opportunity to address the issue, the Government contends that Detective Popp was beyond the curtilage of Bowers's home when he observed Bowers toss the handgun into the neighbor's yard. (D.I. 69 at 13-15.)

Popp's location while making that observation continues to be a matter of conflicting testimony and heated dispute. The defense points to Popp's statement at the first suppression hearing that he was "directly behind" the residence (4/21/05 transcript at 52), and contrasts that (D.I. 70 at 9) with his testimony at the second suppression hearing, during which he stated that he was behind a tree located off to the right of 123 Whitburn's backyard, next to the privacy fence surrounding the neighboring yard. (*See* D.I. 68 at 77, 93; Gov't Ex. 4.) The defense notes that at the first suppression hearing, Detective Popp and counsel for the Government had the following exchange:

> Q. When you were in the backyard of the defendant's residence and you were making your observations and you saw the defendant come to the window –
> A. Yes.
> Q. – were you able to see that it was the defendant?
> A. Yes.

(4/21/05 transcript at 68.)

The Government calls differences in Detective Popp's testimony "confusion" that has been resolved by his statements at the second suppression hearing. (D.I. 69 at 14.) However, the Detective's testimony is indeed fundamentally inconsistent on this important point, and the inconsistency is not resolved by his later testimony; it is created by it. It may be that his earlier statements were the product of some confusion, but they are on the record and are not easily reconcilable with his later testimony. I therefore

8

conclude that, based on the present record, the Government has failed to carry its burden of showing that Detective Popp was outside the curtilage of the defendant's property when he was witnessing the defendant's efforts to dispose of evidence. In short, I am in agreement with Judge Farnan that the question is not one of abandonment of property observed from afar but rather one of observations made during a search.

However, I also concur with Judge Farnan's ultimate conclusion that the search was lawful and the observations made during it do not lead to the suppression of the gun. While the defense pointed to aspects of the Government's case that it believes to be weak, particularly attacking Detective Stout's credibility,[8] I am nevertheless left with a record that persuades me that Probation Officer Kelly had in mind the five factors he said he did, see supra at 4, when he went to conduct the search, with the authorization of his supervisor. Bowers had been convicted and arrested for drug trafficking offenses, and on at least three separate occasions he was the subject of information delivered to the GTF indicating that he continued to be involved in drug trafficking. The last tip came to him the night he decided to undertake a search. Thus, whether or not Kelly followed with fidelity the procedural guidelines of the State's Department of

---

[8]The defense implies that Detective Stout's failure to forward the fingerprint report was deliberate and was consistent with other discovery defalcations in a case he was involved in previously. (D.I. 70 at 11.) Though I in no way condone the late delivery of the fingerprint report, I am reviewing all of the evidence that was provided to me, not just the discovery problem about which the defense rightly complained and not just the implications that problem has for witness credibility.

9

Probation and Parole,[9] he had a reasonable suspicion of illegal activity warranting the search of probationer Bowers's residence.

Judge Farnan has already laid out the applicable law (see D.I. 38 at 6-9) on this issue, and there is no need to repeat it in detail here. It is enough to note that "[a] State's operation of a probation system ... presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements[,]" *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987), and that "no more than reasonable suspicion" can be sufficient to justify the search of a probationer's house, *United States v. Knights*, 534 U.S. 112, 121 (2001). Whether suspicion is "reasonable" is judged on the totality of the circumstances. *Alabama v. White*, 496 U.S. 325, 330 (1990). The circumstances are not to be reviewed and rejected piecemeal, as is the defense approach in its briefing. (D.I. 70 at 18-23.)

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Id.*

---

[9]The defense argues that Officer Kelly failed to comply with a probation office administrative procedure that required him to "ascertain the reliability of any informant and to see if the information could be corroborated." (D.I. 70 at 17-18.) Assuming that reading of the procedure is accurate, that does not make the totality of the circumstances Officer Kelly had before him less than they were, namely a basis for reasonable suspicion.

10

The information that Officer Kelly was working with can fairly be described as rising to the level of reasonable suspicion.[10] Consequently, as Judge Farnan concluded, I too conclude that the search was lawful and that gun at issue may be used in evidence against the defendant.

IV. CONCLUSION

Accordingly, it is hereby ORDERED that the defendant's Motion to Suppress (D.I. 12) is DENIED.

_____
UNITED STATES DISTRICT JUDGE

June 5, 2006
Wilmington, Delaware

---

[10] The defense makes a final argument for suppression based on Probation Officer Edwards's efforts to lure Bowers to the front door. (D.I. 70 at 23-24.) Despite the distaste the defense expresses, those efforts have no bearing on the decision here. Detective Popp was properly where he was and saw what the defendant chose to do after being told a probation officer was at the front door.

11